# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2111
_____

Tamela Montgomery,

*Plaintiff - Appellant,*

v.

City of Ames; Suzanne Owens, individually and in her official capacity as a Law Enforcement Officer for the City of Ames Police Department; Heath Ropp, individually and in his official capacity as a Law Enforcement Officer for the City of Ames Police Department; Christine Crippen, individually and in her official capacity as a Law Enforcement Officer for the City of Ames Police Department; John Doe, individually and in his official capacity as a Law Enforcement Officer for the City of Ames Police Department; State of Iowa; John Baldwin, individually and in his official capacity as Director of the Iowa Department of Corrections; Curt Forbes Residential Center; John McPherson, individually and in his official capacity as Manager of Curt Forbes Residential Center,

*Defendants - Appellees.*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: December 13, 2013
Filed: April 10, 2014

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Tamela Montgomery was seriously injured when Angenaldo Bailey broke into her house and shot her three times. Montgomery brought a claim under 42 U.S.C. § 1983 and several state-law negligence claims against the City of Ames, several Ames police officers, the State of Iowa, the director of the Iowa Department of Corrections John Baldwin, the Curt Forbes Residential Center, and John McPherson, the manager of the Residential Center. Montgomery alleged that the City of Ames and the defendant officers (the "City Defendants") violated her constitutional right to bodily integrity by creating the danger that Bailey would attack her and by acting with deliberate indifference to that danger both before and after she was shot. She also alleged that the State of Iowa, Baldwin, the Residential Center, and McPherson (the "State Defendants") acted with deliberate indifference to Bailey's history of violating a protective order. After the City Defendants moved for summary judgment, the district court granted summary judgment for all defendants on the § 1983 claims and dismissed without prejudice the state-law claims. Montgomery appeals. We affirm in part, reverse in part, and remand for further proceedings.

I.

Because we are reviewing a grant of summary judgment, we describe the facts in the light most favorable to Montgomery. On June 3, 2009, based on Bailey's conviction for second-degree domestic-abuse assault, an Iowa court issued a protective order prohibiting Bailey from contacting Montgomery and from "be[ing] in the immediate vicinity of [her] residence." The protective order stated that Bailey faced immediate arrest if he violated the order.

On the afternoon of September 28, 2009, Montgomery contacted the City of Ames police department to report that Bailey had been calling her and visiting her home, in violation of the protective order. City of Ames police officer John Mueller

-2-

responded and discussed Montgomery's allegations with her. He informed Montgomery that he would attempt to find Bailey to "get his side of the story" and would return that night. Montgomery warned Mueller that if he contacted Bailey but did not arrest him, then Bailey likely would return to her home and retaliate violently against her.

Mueller went to the Residential Center, the state-run halfway house in which Bailey resided, to speak with him. A probation officer at the halfway-house told Mueller that Bailey was at a nearby workforce-development office. Mueller found Bailey at the office and explained Montgomery's allegations; Bailey denied going to Montgomery's residence or calling her, and claimed that she had been calling him. Mueller instructed Bailey not to contact Montgomery in any way, but did not arrest him.

Mueller then returned to Montgomery's house. Montgomery admitted that she had made some calls to Bailey. Mueller told her that the investigation would continue the next day. According to Montgomery, Mueller also advised her that Bailey was in the Residential Center for the night, that she would be safe in her home, and that she should call the police if Bailey came to her house that night. Later that afternoon, around 5:00 p.m., police received reports that Bailey had been riding a bicycle in Montgomery's neighborhood.

Some time after 8:00 p.m., Bailey, armed with a gun, broke into Montgomery's home. Two occupants of the home—Leola Beasley and Quincy Akins—fled in different directions. Montgomery ran upstairs and barricaded herself in a bedroom by pressing her body against the door. While running up the stairs, Montgomery called 911 for assistance.

Bailey followed Montgomery and shot her three times through the bedroom door. An off-duty officer, Joel Congdon, who lived nearby, reported hearing several

noises that sounded like gunshots at 8:25 p.m. Shortly thereafter, Bailey shot himself in the head and fell down the stairs. Montgomery heard Bailey's final shot and the sound of his body falling, but she did not immediately know whether he was dead. Within minutes of calling 911, Montgomery reported to the operator that Bailey had shot both her and himself.

At approximately 8:30 p.m., officers were dispatched to Montgomery's house and established a perimeter around the immediate vicinity. Defendant Christine Crippen was the first officer to arrive. The officers requested that the department dispatch its emergency response team, which was activated at approximately 8:47 p.m. The team arrived at 9:38 p.m. and entered the house soon thereafter.

Officer Congdon encountered Beasley near his house shortly after 8:25 p.m. and brought her inside. She initially told him that Bailey had shot himself, but then told him that Bailey might have run out of the rear entrance of Montgomery's house. Congdon relayed this information to the officers arriving at the scene. When Congdon returned to his house and spoke with Beasley again, she told him that, while exiting Montgomery's house, she saw Bailey lying on the staircase, bleeding from the head. Congdon returned to the scene and again briefed the officers on what Beasley had told him. Akins similarly reported to an officer that he had heard shots fired and then left the house, but he did not provide any further information on Bailey's whereabouts or status. Officers at the scene were unable to determine whether Bailey was inside or outside the house, or whether he was alive or dead. At some point, Montgomery yelled to the officers that Bailey was "inside the house and lying on the stairs."

At several points while the officers waited outside, Montgomery told the 911 operator what she knew of Bailey's condition. Roughly twenty minutes into the call, at approximately 8:45 p.m., Montgomery told the operator that Bailey was "on the ground" and "down." A few minutes later, she said, "He is down, they can come in." Several minutes after those statements, at approximately 8:52 p.m., the call

disconnected. Montgomery made contact with the 911 operator again at approximately 9:25 p.m. She reported that she had looked out the bedroom door and that Bailey was dead at the bottom of the stairs. She continued to insist that Bailey was dead and that officers could enter the house until approximately 9:38 p.m., when the emergency response team arrived, entered the house, and began to aid her.

Defendant Heath Ropp was a member of the emergency response team and led the team's entry into the house. The team found Bailey at the base of the stairs, barely breathing. He died from the head wound approximately a week later. Defendant Suzanne Owens was off duty but on call at the time of the incident; she received a call at approximately 8:30 p.m. informing her of the situation. She arrived at the scene after the emergency response team had assembled; she interviewed Akins and Beasley, and she ultimately prepared an incident report.

Montgomery brought this lawsuit, alleging that the defendants violated her substantive due process right to bodily integrity. In particular, she alleged that John Doe—whom the parties agree is Officer Mueller—created the danger that Bailey would attack her by informing Bailey of her complaint but not arresting him. She alleged that Officers Owens, Ropp, and Crippen responded to the scene, but "did nothing until well after [she] had been shot by Mr. Bailey, and after Mr. Bailey had shot himself." The officers' alleged deliberate indifference, she claimed, was the result of policies and procedures implemented by the City of Ames.

Montgomery separately alleged that McPherson, as the manager of the Residential Center, acted with deliberate indifference to Bailey's history of violating the protective order prohibiting him from contacting Montgomery. She claimed that the Residential Center, Baldwin, and the State of Iowa maintained "official policies . . . of failing to prevent individuals in custody from violating protective orders" and "failed to establish an adequate and sufficient policy . . . for training supervisors and officers within the Department [of Corrections] and [the Residential Center] relating

to individuals in custody violating protective orders." She also brought state-law negligence claims against several of the defendants.

Owens, Ropp, Crippen, Doe, and the City of Ames moved for summary judgment, arguing that Montgomery failed to present sufficient evidence that their actions violated her constitutional rights. The State of Iowa, Baldwin, the Residential Center, and McPherson did not move for summary judgment. The district court concluded that because Montgomery could not establish a constitutional violation, the City of Ames was entitled to judgment as a matter of law and the other defendants were entitled to qualified immunity. The district court then ruled that summary judgment was appropriate for "all Defendants" on the § 1983 claims. Declining to exercise supplemental jurisdiction over the state-law claims, the district court dismissed those claims without prejudice.

Montgomery appeals, arguing first that the district court erred in ruling that she could not establish a constitutional violation by the City Defendants and second that the district court erred in granting summary judgment for the State Defendants without providing her notice and an opportunity to be heard.

II.

We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to Montgomery and drawing all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Because the individual defendants have asserted qualified immunity, we consider whether Montgomery has produced sufficient evidence to create a genuine issue of fact regarding whether the defendants violated a clearly established right. *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013). To establish a submissible claim against the City of Ames, Montgomery must show a genuine issue for trial about whether an individual official committed a constitutional violation pursuant to an official custom,

policy, or practice of the governmental entity. *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009).

A.

The Due Process Clause generally does not provide a cause of action for "a State's failure to protect an individual against private violence." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). Our precedent establishes, however, that the Constitution requires a State to protect a person in two circumstances: when the person is in the State's custody, and when the State created the danger to which the individual is subjected. *See Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 2011).

Montgomery argues that the City Defendants created the danger that Bailey would harm her. To succeed on that theory under our precedent, she must show:

> (1) that she was a member of a limited, precisely definable group, (2) that the municipality's conduct put her at a significant risk of serious, immediate, and proximate harm, (3) that the risk was obvious or known to the municipality, (4) that the municipality acted recklessly in conscious disregard of the risk, and (5) that in total, the municipality's conduct shocks the conscience.

*Id.* at 891 (internal quotations omitted).

To shock the conscience, as required by the fifth element identified in *Fields*, an official's action must either be motivated by an intent to harm or, where deliberation is practical, demonstrate deliberate indifference. *See Hart v. City of Little Rock*, 432 F.3d 801, 805-06 (8th Cir. 2005). Deliberate indifference requires both that the official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the official actually draw that

inference. *Id.* at 806 (internal quotation omitted). Mere negligence, or even gross negligence, is not actionable. *Id*. at 805-06. Viewing the facts in the light most favorable to Montgomery, we conclude that she has failed to establish conscience-shocking conduct on the part of any of the City Defendants.

1.

We first address Montgomery's claims against John Doe. While the parties agree that "John Doe" is Officer Mueller, they dispute whether the claims against "John Doe" should be dismissed based on Montgomery's failure to amend the complaint to add Mueller as a defendant or to serve Mueller with process. While failure to identify and serve an unnamed defendant during discovery could well have justified dismissal of the claim, *see Williams v. Rodriguez*, 509 F.3d 392, 402 (7th Cir. 2007), the district court was correct to dismiss this claim on the merits in any event. Even if Montgomery had successfully amended her complaint to name Mueller as a defendant, she still could not show that his actions violated her due process rights.

Montgomery contends that Mueller created the danger that Bailey would attack her when he spoke with Bailey about Montgomery's allegations but did not arrest him, despite Montgomery's warnings. Assuming for the sake of analysis that a police officer's investigation of an alleged crime ever could give rise to a state-created danger for purposes of due process analysis, Mueller's behavior does not rise to the level of deliberate indifference. It was reasonable for Mueller, after hearing Montgomery's allegations, to investigate whether Bailey had violated the protective order. After Mueller interviewed Bailey, it is undisputed that he was faced with conflicting accounts regarding whether Bailey had violated the protective order. Under those circumstances, a reasonable jury could not conclude that Mueller acted recklessly or in a conscience-shocking manner by declining to arrest Bailey before the investigation proceeded the next day. Montgomery emphasizes that there is a disputed issue of fact about whether Bailey violated the protective order, but that fact is not

material to the question at hand: whether Mueller's actions, given the undisputedly conflicting accounts that he had received, shock the conscience. *See* Fed. R. Civ. P. 56(a). As there is insufficient evidence to show a constitutional violation, "John Doe" or Mueller was entitled to summary judgment.

2.

We also affirm the district court's grant of summary judgment for Officers Owens, Ropp, and Crippen. Montgomery's complaint against these defendants is that they "failed to timely respond to [her] medical needs." The claims fail because nothing the officers did—or did not do—established either a state-created danger or special relationship that imposed on them an affirmative duty to protect Montgomery from third-party harm. *See Gatlin ex rel. Estate of Gatlin v. Greene*, 362 F.3d 1089, 1093 (8th Cir. 2004). Without a state-created danger or special relationship, a failure to respond does not violate due process. *See DeShaney*, 489 U.S. at 197; *Weeks v. Portage Cnty. Exec. Offices*, 235 F.3d 275, 277-79 (6th Cir. 2000); *Bryson v. City of Edmond*, 905 F.2d 1386, 1392-93 (10th Cir. 1990).

Montgomery relies on *Sanders v. Board of County Commissioners*, 192 F. Supp. 2d 1094 (D. Colo. 2001), where a plaintiff who was wounded in a school shooting stated a substantive due process claim against certain law enforcement officers who responded to the scene. *See id.* at 1110-17. In that case, however, the district court concluded that the defendants enhanced the danger the plaintiff faced by "issu[ing] multiple orders refusing to permit any access to or rescue of" the plaintiff. *Id.* at 1112. Montgomery does not allege that Owens, Ropp, or Crippen enhanced the danger she faced by actively preventing anyone from aiding her.

The evidence, moreover, does not support a finding that Owens, Ropp, or Crippen were deliberately indifferent to Montgomery's injuries. Officers outside Montgomery's house faced an uncertain situation: Beasley had given conflicting

reports that Bailey had shot himself in the head and that he had run out of the house. Taking the facts in the light most favorable to Montgomery, she did not report to police officers that Bailey was incapacitated until roughly twenty minutes into her 911 call, at around 8:45 p.m. Owens, who was on call when the incident occurred, acted reasonably by responding to the scene, where the emergency response team had already assembled, and interviewing Beasley and Akins. Ropp, a member of the emergency response team, acted reasonably in joining the team when it was activated at approximately 8:47 p.m. and in aiding Montgomery once the team entered the house. Crippen acted reasonably in working with other officers on the scene to secure a perimeter and in attempting to determine whether Bailey was still in the house and still a threat. Even if Montgomery were correct that Ames police officers reasonably could have entered her house sooner based on her reports that Bailey had shot himself, there is no evidence that the defendants failed to do so out of deliberate indifference to her plight. The district court thus correctly dismissed the claims against Owens, Ropp, and Crippen.

3.

As for the City of Ames, it is liable in a § 1983 suit only if an individual city employee committed a constitutional violation pursuant to an official custom, policy, or practice. *Moyle*, 571 F.3d at 817; *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005). Because Montgomery cannot establish a constitutional violation by any of the individual city defendants, the district court properly granted summary judgment for the City. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).

-10-

B.

Montgomery also argues that the district court erred in granting summary judgment for the State Defendants on her separate due process claims against them. Although the State Defendants did not move for summary judgment, and although the district court's order did not discuss Montgomery's allegations against them, the court granted summary judgment for "all Defendants" and dismissed without prejudice Montgomery's remaining state-law claims because "no federal cause of action remain[ed]" in the case.

A district court commits reversible error by granting summary judgment on an issue not raised or discussed by the parties if the losing party did not have notice and an opportunity to respond. *See Global Petromarine v. G.T. Sales & Mfg., Inc.*, 577 F.3d 839, 844 (8th Cir. 2009); *Heisler v. Metro. Council*, 339 F.3d 622, 631 (8th Cir. 2003); *see also* Fed. R. Civ. P. 56(f). The State Defendants contend that summary judgment in their favor was appropriate even without notice to Montgomery, because the same facts that were raised in the briefs of the City Defendants lead to the conclusion that the State Defendants likewise did not create or enhance a danger to Montgomery. Montgomery's due process claims against the State Defendants, however, rest on distinct factual allegations about whether those parties exposed her to harm by failing to take "discernable or effective steps" in response to Bailey's repeated violations of the protective order. Even if the factual record has been fully developed on those claims, Montgomery had no opportunity to make legal arguments in support of her position. The district court did not mention the claims against the State Defendants, and it is not even clear that the court had those claims in mind when it granted summary judgment for "all Defendants" and dismissed all federal claims with prejudice. We express no view on the merit of Montgomery's claims against the State Defendants, but the denial of notice and an opportunity to be heard requires a remand. *See Williams v. City of St. Louis*, 783 F.2d 114, 116 n.1 (8th Cir. 1986).

-11-

\*      \*      \*

For the foregoing reasons, we affirm the district court's grant of summary judgment for the City Defendants, reverse the grant of summary judgment for the State Defendants, and remand for further proceedings.

———————————————