# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-1792
_____

Tamara Villanueva

*Plaintiff - Appellant*

v.

City of Scottsbluff; Alex Moreno, individually and
in his official capacity as Chief of Police

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: November 13, 2014
Filed: February 20, 2015

_____

Before RILEY, Chief Judge, BEAM and GRUENDER, Circuit Judges.

_____

RILEY, Chief Judge.

After ending her brief affair with Scottsbluff Police Chief Alex Moreno, Tamara Villanueva filed suit against Moreno and the City of Scottsbluff (Scottsbluff) under 42 U.S.C. § 1983 for alleged violations of the Fourteenth Amendment of the

United States Constitution and also state tort law. The district court[1] granted summary judgment in the defendants' favor on the § 1983 claims and declined to exercise supplemental jurisdiction over the state law tort claim. Villanueva timely appealed, and we affirm.[2]

## I.     BACKGROUND

In late 2008, Moreno and Villanueva began a watch group for Villanueva's neighborhood. Villanueva was the group's contact person to the police department, and as the contact person, she regularly communicated with Moreno about problems in the neighborhood. In August 2010, Villanueva expressed to Moreno that she might be the wrong person to lead the neighborhood watch because she had been in an abusive marriage and her ex-husband, Alvaro Villanueva, had assaulted her the previous day. Although Moreno did not file a formal written report or take any official action against Alvaro, the next day Moreno did speak with Alvaro about the incident. On other occasions, Scottsbluff police officers would neither arrest Alvaro nor generate formal written reports after Villanueva complained about domestic disputes. Officers did arrest Alvaro in August 2011 for violating a protection order.

After the August 2010 conversation, Moreno began what Villanueva describes as a "primping process." He spent more time alone with Villanueva and occasionally touched her. At this point, Villanueva viewed Moreno as a "father figure" and believed he was someone she could go to for help in dealing with her abusive relationship with Alvaro. After a neighborhood watch meeting in October 2010, Moreno kissed Villanueva and thereafter started sending her sexually explicit emails and text messages. Moreno's and Villanueva's platonic relationship developed into a sexual one, and they had sexual intercourse on two occasions. In November 2010,

---

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

[2]We exercise appellate jurisdiction under 28 U.S.C. §§ 1291 and 1294(1).

Villanueva ended the relationship and then began experiencing what she believed was harassment. Villanueva observed unknown cars parked outside her house and received threatening phone calls from people whose voices she did not recognize. Because the callers told Villanueva to stay away from Moreno and referenced private conversations between Villanueva and Moreno, Villanueva believed Moreno orchestrated the harassment.

Villanueva reported this harassment to the Scottsbluff police on numerous occasions, and officers were dispatched to Villanueva's house after many of the calls, yet the officers generated only two written reports and took no official action in response to her complaints. Before this alleged harassment, Villanueva had suffered from depression, but the stress of her relationship with Moreno and the subsequent events worsened her symptoms, eventually leading to a diagnosis of depression and Post Traumatic Stress Disorder. Distressed by the perceived harassment, Villanueva sought help from a number of officials at different levels of government before finally filing the instant suit.

Villanueva sued Moreno, in his individual and official capacities, and Scottsbluff for violating the Equal Protection Clause of the Fourteenth Amendment and sued Moreno individually for negligent infliction of emotional distress. The district court also liberally construed Villanueva's complaint to allege substantive due process violations of her right to bodily integrity and her right to be free from state-created danger. The district court granted summary judgment in favor of defendants on Villanueva's constitutional claims and declined to exercise supplemental jurisdiction over the negligence claim. Villanueva appeals.

## II.   DISCUSSION

"We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to [Villanueva] and drawing all reasonable inferences in her favor." Montgomery v. City of Ames, 749 F.3d 689, 694 (8th Cir. 2014).

Villanueva argues the district court did not view the facts in her favor and ignored material questions of fact that should have been submitted to a jury. In support of this argument, Villanueva lists a number of facts she believes the district court either did not address or "whitewashed." Contrary to Villanueva's assertions, the district court directly addressed many of these facts—although not worded as strongly as in Villanueva's legal briefs—and the other facts not addressed are immaterial. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We agree with the district court that Villanueva has not presented a triable issue on any of her claims.

## A. Equal Protection

Villanueva contends Moreno and Scottsbluff violated the Equal Protection Clause by maintaining a policy of not responding to women's complaints of domestic violence, which amounts to gender discrimination. "[T]he state may not 'selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause.'" Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir. 1990) (quoting DeShaney v. Winnebago Cnty. Dept. of Social Servs., 489 U.S. 189, 197 n.3 (1989)). A police department's failure to protect victims of domestic violence can amount to an equal protection violation actionable under 42 U.S.C. § 1983. See Ricketts v. City of Columbia, Mo., 36 F.3d 775, 779 (8th Cir. 1994).

> "In order to survive summary judgment, a plaintiff must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom."

Id. (quoting Hynson v. City of Chester Legal Dept., 864 F.2d 1026, 1031 (3d Cir. 1988)).

Villanueva has produced evidence Moreno and other Scottsbluff police officers did not formally report some of Villanueva's complaints of domestic abuse and did not always arrest Alvaro in response to her complaints. Villanueva additionally points to two other women whose complaints of rape and domestic violence the Scottsbluff police allegedly did not address. These incidents, however, are insufficient to allow a reasonable jury to find the Scottsbluff Police Department had "a policy which was motivated by an intent to discriminate against women." Id. at 781. In Ricketts, we found the plaintiffs' substantial statistical evidence that (1) domestic violence claims resulted in fewer arrests than claims of other types of violence, and (2) the majority of domestic violence was perpetrated against women was not enough to prove an equal protection violation. See id. at 781-82. Villanueva has brought forward far less evidence than the plaintiffs in Ricketts. Her smattering of anecdotal experiences is not enough under the law to prove a violation of the Equal Protection Clause.

Indeed, Villanueva has made no showing the department's alleged failure to respond to domestic violence was motivated by an intent to discriminate against women. Villanueva contends "a jury could conclude that it was [Villanueva's] gender that motivated the policy and/or custom of inaction" because Villanueva "and other females in the community" did not receive adequate police responses to their complaints of rape and domestic violence. But evidence that those who received inadequate responses were women—without more—is not proof of discrimination. A policy that does not facially discriminate against a discrete group will not violate the Equal Protection Clause without some showing of discriminatory purpose. See, e.g., Washington v. Davis, 426 U.S. 229, 238-42 (1976). Proving discriminatory purpose is no simple task. It requires a showing that the law or practice in question was "implemented 'at least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" Ricketts, 36 F.3d at 781 (quoting Personnel Admin. of Mass. v. Feeney, 442 U.S. 256, 279 (1979)). Villanueva's contention that

-5-

the domestic violence and rape complaints of three women—including Villanueva—went unaddressed is simply not enough to demonstrate discriminatory purpose.

### B.    Substantive Due Process

The district court also determined there were no triable issues concerning Villanueva's substantive due process claims.  Although we question whether Villanueva even raised substantive due process violations in her complaint, we agree with the district court that, to the extent she did so, her claims lack merit.

### 1.    Right to Be Free from State-Created Danger

Villanueva, advancing the district court's interpretation of her claims, argues Moreno's failure formally to report her claim of domestic abuse and the department's failure to respond to her claims of harassment denied her due process.  "As a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  DeShaney, 489 U.S. at 197; accord Beck v. Wilson, 377 F.3d 884, 889 (8th Cir. 2004).  One exception to this principle is the "state-created-danger theory" under which "'the state owes a duty to protect individuals if it created the danger to which the individuals are subjected.'" Fields v. Abbott, 652 F.3d 886, 890 (8th Cir. 2011) (quoting Hart v. City of Little Rock, 432 F.3d 801, 805 (8th Cir. 2005)).  To establish such a duty, Villanueva must show:

> "(1) that she was a member of a limited, precisely definable group, (2) that the municipality's conduct put her at a significant risk of serious, immediate, and proximate harm, (3) that the risk was obvious or known to the municipality, (4) that the municipality acted recklessly in conscious disregard of the risk, and (5) that in total, the municipality's conduct shocks the conscience."

Montgomery, 749 F.3d at 694-95 (quoting Fields, 652 F.3d at 891).  There is no evidence in this record indicating the department's and Moreno's failures to respond to Villanueva's complaints "put her at a significant risk of serious, immediate, and proximate harm."  Id. at 694.

In support of her claim, Villanueva points to her inability to receive a protection order against Alvaro because there were no documented complaints upon which a court could base such an order.  Villanueva's inability to obtain a protection order did not "render [her] more vulnerable to risks created by others," S.S. v. McMullen, 225 F.3d 960, 962 (8th Cir. 2000) (en banc), but rather left her in the same situation as before she sought the protection order.  Absent some *increased* danger due to the defendants' inaction, there is no due process violation.

Finally, the challenged conduct was not so egregious as to "shock the conscience."  Montgomery, 749 F.3d at 695.  "To shock the conscience, . . . an official's action must either be motivated by an intent to harm or, where deliberation is practical, demonstrate deliberate indifference. . . . Mere negligence, or even gross negligence, is not actionable."  Id.  Villanueva's evidence shows Moreno failed formally to report one complaint of domestic violence—although he informally met with Alvaro to address Villanueva's complaint—yet the department did respond to other complaints and generated at least one written report.  Similarly, Villanueva's other complaints of domestic violence did not always result in Alvaro's arrest, but did on at least one occasion.  As to the later harassment complaints, officers always were dispatched in response to Villanueva's complaints—and these officers generated two written reports—but chose not to initiate investigations or make any arrests.

"[D]iscretion is essential to the criminal justice process," McCleskey v. Kemp, 481 U.S. 279, 297 (1987), and officers cannot be expected to make an arrest or initiate a formal investigation in response to every complaint, see, e.g., Ricketts, 36 F.3d at 780 ("A municipality which, in order to protect itself against the kind of claim brought

by the plaintiffs here, directed its officers to arrest every person against whom an allegation of spousal abuse was made would undoubtedly find itself facing Section 1983 claims of unconstitutional arrest without probable cause."). The officers' conduct here was a valid exercise of police discretion, not a conscience-shocking disregard of Villanueva's complaints or her constitutional rights.

### 2. Right to Bodily Integrity

Villanueva's final argument is Moreno used his position as police chief to coerce her into a sexual relationship, violating her right to bodily integrity. "'The Eighth Circuit has recognized a substantive due process violation in some instances of sexual misconduct by police officers.'" Cavataio v. City of Bella Villa, 570 F.3d 1015, 1022 (8th Cir. 2009) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 574 (8th Cir. 2009)); see, e.g., Hawkins v. Holloway, 316 F.3d 777, 783-86 (8th Cir. 2003); Rogers v. City of Little Rock, Ark., 152 F.3d 790, 796-97 (8th Cir. 1998); Haberthur v. City of Raymore, Mo., 119 F.3d 720, 723-24 (8th Cir. 1997). And in Rogers, we specifically found a due process violation when a police officer mentally coerced—rather than physically forced—a woman into sexual intercourse. See Rogers, 152 F.3d at 797. A violation of the right to bodily integrity must be "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Id. (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

Villanueva contends Moreno, knowing she was vulnerable because of her history of spousal abuse, used his authority to entice her into a sexual relationship. Villanueva acknowledges she did not object to the relationship with Moreno, but maintains she felt forced to continue the relationship because she needed Moreno's help with the neighborhood watch and to escape her abusive ex-husband. Villanueva likens her situation to that in Rogers, claiming "Moreno took advantage of his position and [Villanueva's] mental state[,] over time coercing [Villanueva] to engage in an unwanted sexual relationship."

-8-

The factual differences between Villanueva's situation and the situation in Rogers are substantial. In Rogers, an on-duty, armed, and uniformed officer followed a woman home after pulling her over for a broken tail light. See id. at 793. The officer entered the woman's house, demanded she undress, and had sexual intercourse with her. See id. at 793-94. Although the woman never objected, we still recognized this encounter as a rape: "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective." Id. at 797. In contrast to Rogers, Villanueva's sexual encounters with Moreno occurred while Moreno was off-duty, were not connected to any exercise of Moreno's authority as an officer, and can only be described as a consensual sexual relationship between adults. Although Villanueva now claims to have been coerced, her contemporaneous email and diary notes show she was attracted to Moreno and consented to the relationship with him.

Villanueva, relying on the testimony of her counselor, argues Moreno coerced her by engaging in what the counselor describes as a "primping process" or "pruning process" where Moreno "set[] the stage for [Villanueva] to become a sexual partner." Through this process, Villanueva asserts Moreno—knowing of Villanueva's fragile mental state and that she sought his help as a law enforcement agent—set up meetings where Moreno could see Villanueva alone and began casually touching Villanueva in an attempt to escalate their relationship beyond friendship. Villanueva's counselor acknowledged, however, that "[i]n all [romantic] relationships there is a pruning process." The evidence does not suggest Moreno coerced Villanueva into sexual relations through an abuse of his authority so egregious and outrageous that it shocks the conscience. See id. Although Moreno arguably acted inappropriately in pursuing a relationship with Villanueva, viewing the evidence in the light most favorable to Villanueva, Moreno's conduct cannot be likened to the rape perpetrated in the Rogers case and does not rise to the level of a due process violation.

## III. CONCLUSION

We affirm the well-reasoned decision of the district court.

_____